**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-198-LMB** |
| **v.** | : | |
| | : | |
| **MARCELIN SATURNE,** | : | |
| | : | |
| | : | |
| **Defendant** | : | |

**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR A VARIANCE**

Defendant Marcelin Saturne ("Mr. Saturne") submits this Memorandum and Request for a Variance to assist the Court in imposing a reasonable sentence that is sufficient, but not greater than necessary, to meet the sentencing goals of 18 U.S.C. § 3553(a). Based on all the factors set forth in Section 3553(a), if this Court elects not to place Mr. Saturne on an extended period of probation, counsel for Mr. Saturne respectfully requests that this Court vary from the sentencing guidelines and impose a sentence no more than 18 months of incarceration.

## PRELIMINARY STATEMENT

After his arrest on June 21, 2021 as part of a reverse sting operation with a government-sponsored confidential informant, Mr. Saturne promptly accepted responsibility and entered a guilty plea to one count of conspiracy to distribute 5 kilograms or more of cocaine. The arrest and this court case served as the proverbial wake-up call for Mr. Saturne, a man who, apart his selling drugs, raised his younger sisters when still a child himself, served his country under mortar fire in Iraq under threat of great bodily injury and even death, and demonstrates personal creativity and artistic ability that inspires others – both adult patrons of his art and the teenagers whom Ms. Saturne has mentored since prior to his arrest.

1

Since his arrest, Mr. Saturne has avoided all persons associated with criminality and focused on finding his way back on to the better path in life. Mr. Saturne is working a full-time job, praying weekly with his parents and sisters, abstaining from marijuana and cocaine, parenting his 12-year-old daughter, committing to his girlfriend and their anticipated baby, and preparing himself to be gainfully employed and fully engaged with his community and city in a clear-headed, lawful manner.

A.  The Presentence Report

Counsel has reviewed the Presentence Investigation Report prepared for Mr. Saturne by the United States Probation Office (the "PSR") and has no objections to the advisory guideline calculations. Counsel agrees that, with adjustments, Mr. Saturne's total offense level is 27, and he is in Criminal History Category I because he has no prior qualifying criminal convictions or charges. Counsel further agrees that Mr. Saturne is safety-valve eligible. As a result, his advisory guidelines range is 70 to 87 months. Mr. Saturne has no objections to the PSR.[1]

B.  U.S.S.G. § 5H.1.11

The PSR writer takes no position on Mr. Saturne's request of application of U.S.S.G. § 5H1.11. Mr. Saturne does not object to the non-position. Mr. Saturne does ask the Court to grant a downward departure under this provision. The Fourth Circuit's decision in *United States v. Rybicki*, 96 F.3d 754 (4th Cir. 1996) concerned an earlier version of the Guidelines when prior military service was denoted as a "discouraged factor" "not ordinarily relevant" to sentencing departure. 96 F.3d at 758. The provision was subsequently amended in 2010 to look at military service from the opposite perspective and to amplify the mitigating relevance of such service.

---

[1] The PSR indicates an earlier objection to paragraphs 24 of the PSR. Upon review of the final PSR, which does report that Mr. Saturne was a committed artist even while selling drugs, Mr. Saturne does not object to paragraph 24.

Mr. Saturne's military service in the combat arena, "individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases," U.S.S.G. § 5H1.11, of non-service members or of service members who did not deploy to war, otherwise covered by the guidelines. Mr. Saturne therefore requests a 2-level downward departure.[2] *See e.g.*, *United States v. Johnson*, 464 F. Supp.3d 22, 33 (D.D.C. 2020) (Brown Jackson, J.) (applying 2-level downward departure under § 5H1.11). In addition to the request for a departure and in the alternative to such a request, Mr. Saturne respectfully moves the Court to account for his military service, including his service in Iraq, as favorable sentencing information under 18 U.S.C. § 3553(a), in varying downward from the advisory guidelines.

**I.      History and Characteristics of the Defendant, Marcelin Saturne**

A.   Childhood – taking on early responsibility and enduring physical beatings

Mr. Saturne immigrated to the United States with his family, originally from Haiti, from St. Maarten when he was in the second grade. He was raised in a hard-working, blue-collar immigrant family. His parents have worked tirelessly their entire lives, including when their children were young; and consequently, their four children were frequently left alone. Mr. Saturne was the oldest of the children. His parents greatly abdicated their parental home duties because of work, and he took on the responsibility of raising his three younger sisters, Josee, Sandra, and Fabiola. *See* Exhibit 3 ("We all relied on him."); Exhibit 4 ("[I] always saw my brother as a second father figure. When my parents would go off to work in the morning, it was him who made sure we were clothed and fed before heading off to school."); Exhibit 5

---

[2] The advisory guidelines range for Offense Level 25, Criminal History Category I is 57-71 months.

("Growing up in our household wasn't the easiest."). His parents acknowledge their absence. Exhibit 2 ("We worked a lot and regrettably could not be as present in our children's lives as we would have wanted.").[3]

The parents "brought our culture into disciplining our children, *id.*, and now recognize that what may have been permitted in Haiti when they were raised could be considered child abuse under American norms, *id.* Indeed, anger often led to discipline. PSR, ¶ ¶ 68, 69. Violence within the home connected to the father's anger. When Mr. Saturne was around 9 years old, his father beat him so badly with an extension cord that Child Protective Service was called. PSR ¶ 69. By that governmental oversight, Mr. Saturne's father learned the lesson not to use an extension cord. From that point forward, he changed to using a belt on Mr. Saturne. PSR ¶ 68. CPS did not return. Eventually, as the girls became older, they were able to convince their parents not to resort to corporal punishment. PSR ¶ 69; Exhibit 3.

The home was a tough one to stay in. While a child trying to protect his younger sisters, Mr. Saturne also tried to evade the abuse by running away to a friend's house. PSR ¶ 70. His mother too had to escape from the anger within the home – she would disappear for days at a time to get away, *id*. By the time of high school, Mr. Saturne was more physically imposing to his father, the family was more financially stable, and the family engaged more with the church. Circumstances improved. PSR ¶ 71. Mr. Saturne graduated from high school in 2007. PSR ¶ 92. He did not want to stay with his parents. He wanted/needed to get away.

///

///

---

[3] Please note that personal identifiers are generally redacted from exhibits to privacy purposes. Counsel will provide redacted addresses and phone numbers to the Court's staff and to the government promptly upon request.

B.  Fighting in Iraq –being under daily threat of imminent physical danger and death

During the height of the wars in Iraq and Afghanistan, Mr. Saturne enlisted first in the U.S. Army Reserves and then in the regular U.S. Army. The Army, together with the Marines, was one of the two service branches most likely to send personnel overseas to combat operations, and teenaged Marcelin understood that he was likely to be deployed. Mr. Saturne was consistently promoted, achieving the rank of Sergeant (E-4) while in Iraq, with responsibility for the safety and lives of other soldiers under his command.

Marcel Saturne served in Iraq for 13 months in 2008-09. Exhibit 21. Sgt. Saturne's unit deployed to Joint Base Balad ("JB Balad"), formerly known as LSA Anaconda. When known as LSA Anaconda, soldiers and airman nicknamed the base "Mortaritaville" because of the daily mortar rounds and rockets that attacked the base. During the time that Mr. Saturne was at JB Balad, the base continued to frequently come under mortar fire. Sgt. Saturne and his unit were in medical logistics. They rode in Chinook helicopters off-base to provide medical supplies. Sgt. Saturne saw up-close the horror of war. He interacted with wounded soldiers in hospitals, medical units, and during evacuations. When Sgt. Saturne left JB Balad, whether by Humvee caravan or Chinook, he – like all soldiers – anticipated attacks by IEDs, rocket launchers, and small arms fire. While Mr. Saturne himself endured no physical injury, others were not so lucky. His duty assignment caused him to witness other injured comrades. Even more so, an IED blew up and killed one of his best friends.

*Only 1 percent of our population today will ever wear the uniform of this nation in any of its incarnations* – soldier, sailor, airman, Marine, active, Guard or Reserve. *See* Harry Schuster, *US Troops: The Real One Precent,* CBS News (May 25, 2012), *available at* U.S. Troops: The real one percent - CBS News ("after covering the wars in Afghanistan and Iraq for the last ten

years -- including numerous trips to the war zones and to military communities here at home -- I've learned there's another one percent, who I call the real one percent. . . . The rest of us are the 99 percent.").

Of those who served, many have not gone to war – the percentage of such citizens within the cohort of those who put their own lives at risk is even smaller. Mr. Saturne rests within that special, unusual cohort. As a result of his service – including operations at JB Balad and hazardous assignments off the base in-country, Mr. Saturne received the following medals/commendations: Army Commendation Medal (ARCOM); Meritorious Unit Commendation; Iraq Campaign Medal with two Campaign Stars; National Defense Service Medal; Global War on Terrorism Service Medal; Army Service Ribbon; and Overseas Service Ribbon. Exhibit 21.

The absence of physical injuries does not mean that Mr. Saturne was uninjured by his combat service. "[W]e don't really understand what that service really means for these members of the military. We don't understand that the cost of war doesn't end when the troops come home, but is instead often paid out over the years." Schuster, *supra*. Counsel interviewed General David Petraeus in reference to another soldier who went to Iraq and years later was facing a criminal sentencing. As Gen. Petraeus walked away from the interview, he stopped, turned back, and looked counsel in the eye: "Don't ever forget that nobody came back from that war the same. And nobody came back better." When privileged to represent someone who took an oath to protect and defend the rest of us and went to war on our behalf, counsel has never forgotten to look beyond how the soldier or marine presents themself to others and to find the truth of the effects of the service member's experience.

Like others within the small cohort who went to war on our behalf, Mr. Saturne did (and does) suffer from his tour in Iraq. He came back from the desert a changed man – and not for the better. He came back traumatized by his experience, in pain, and without the social and emotional tools to address his needs. His mental health needs continue to this day. Witnesses report that Mr. Saturne experienced the classic symptoms of PTSD, with nightmares and night sweats. *See* Exhibit 2 ("When he returned home we knew that what he experienced overseas was hard as his mother had to change his bedsheets often. We did not know what to do. We just prayed and hoped that it would be enough."); Exhibit 3 ("I remember his nightmares and my mother helping to change his bedsheets in we left him to figure it out on his own….").

The U.S. Army of a decade ago was not one where a soldier could readily admit mental health problems and seek out treatment. Its culture did not encourage such vulnerability; rather, its expectations for promotions strongly discouraged it. Like other soldiers, Mr. Saturne kept inside him how he was feeling. After he concluded his deployment in Iraq and went "down range," Mr. Saturne's PTSD manifested by heavy drinking – condoned in the military – and the numbing use of marijuana – decidedly not tolerated. The drug use had consequences. Mr. Saturne was reduced one level in rank and discharged from the service with a perfunctory exit medical examination – receiving a general discharge under honorable conditions in late January 2011from a U.S. Army base in Germany. *See* Exhibit 21.

C.  Falling into the nightlife and party scene of San Diego and beginning to sell drugs

Still not 23 years old, Mr. Saturne was lost. He returned home to New Jersey feeling like a failure, without purpose. He had left the Army before he had planned and was ready. And he was troubled by his Iraq service, and still drinking and using marijuana to compensate. As a child

and teenager, New Jersey had been a place to leave, but he found himself stubbornly affixed there. He had to go.

Mr. Saturne chose as far away as he could to start a new life. Like many others who moved to California for a reset, he made his way to San Diego, California. Mr. Saturne both socialized and worked in the nightclub scene. He continued to drink and use marijuana. He also started to use cocaine, usage which did not end until his arrest earlier this year. For the 20-somethings who went out and partied in San Diego, drinking to excess and using drugs was typical. Mr. Saturne had deeper reasons for his usage than pleasure; regardless of the motivating cause, he allowed himself to lose himself to drugs and now is paying the price.

No longer a soldier, Mr. Saturne tried to find his new identity. He turned to his lifelong interest and talent with fashion and art. "Marcelin has always been creative whether it was with music, designing apparels or painting. . . The creative judices were constantly flowing for him." Exhibit 3. He obtained professional respect! For example, Mr. Saturne's Urban Executive fashion line was highlighted as a Fashion Week San Diego 2015 Designer Spotlight. Media from the event described both the difficult straights that Mr. Saturne was in when he moved to San Diego and his positive can-do personality:

> Upon his honorable discharge in the United States Army he went back home to New Jersey to find little employment opportunities. On a whim and a prayer Marcelin sold all of his belongings and moved to San Diego, CA without having a job or a place to stay. Marcelin's optimism eventually paid off. . . . In Marcelin's own words, "Fashion is an expression of art, a way for the soul of the designer to interact with others."

http://fashionweeksd.com. *See also* Danielle Directo-Meston, *A Shot at Success*, PACIFIC SAN DIEGO MAGAZINE (2015) ("After being honorably discharged from the Army, Marcelin Saturne decided to aim high. Following his heart's orders, Saturne sold everything he owned and moved from New Jersey to San Diego to pursue his passion for fashion."); Exhibit 10 ("Chasing his

artistic and creative dreams, he began a career in fashion, designing clothing and showcasing them in his own fashion shows for other young, aspiring artists.").

Professional respect greatly exceeded financial profit. Mr. Saturne was getting known in the San Diego fashion scene, but he was not making much money – a them that repeats itself again with regard to his artwork after he moves to Washington, D.C. Mr. Saturne hustled. Yes, he made some money from his fashion line and he also worked at clubs in the evenings, but for daily living expenses – including his growing drug habit and expensive tastes associated with the nightlife crowd, he went beyond *using* marijuana to *selling* it.

D. <u>Mr. Saturne moves to Washington, D.C., where he makes the horrible, fateful decision to switch from selling marijuana to cocaine</u>

Since leaving the Army, Mr. Saturne's life had taken a sharp, downward detour in just a few years. In 2018, as he was turning 30, Mr. Saturne moved to Washington, D.C. He continued to sell marijuana, from sources he had in San Diego. He continued to use both marijuana and cocaine. Cocaine cost more for Mr. Saturne to buy than marijuana. He could see (and he was told by people he met in D.C.) that selling cocaine was more lucrative than selling marijuana. He knew people who were part of the local cocaine trade. They wanted someone who could help them get cocaine to sell in this area. Looking for easy money, he impulsively and foolishly switched his drug trade from marijuana to cocaine, relying upon his cocaine connections in San Diego to mail packages of cocaine to him in Washington, D.C. With this increased in criminal activity and exposure, Mr. Saturne truly hit bottom, as far away from good decision-making as possible.

As the Information sets forth, Mr. Saturne started to sell cocaine in 2019. In late 2019, his San Diego supplier became unreliable and untrustworthy. Mr. Saturne stopped selling. In March

2020, the pandemic hit and everything slowed down. Thus, for over a year, from late 2019 until around January 2021, Mr. Saturne did not sell drugs – although he continued to use.

Mr. Saturne *is* a talented, natural artist. "[N]othing made me prouder then when Marcelin started painting. I always knew he had the innate talent just waiting to be set free. He could paint for hours. Once he started a piece it was hard to him to take a breaking. Creating art is definitely where my brother found his calling." Exhibit 5. "He began painting, and worked from sunrise to sunset, creating many works of art to express different emotions in his life." Exhibit 10.

Mr. Saturne has both lived and worked as an artist – although one who has derived little income from sales of his artwork – *and* as a dealer of drugs. The first is part of him, the latter he has left behind.

Art is pure for him – it is where he gets to express the emotions he otherwise has bottled up. He both creates art for himself and for others. He is a working professional muralist and painter. He has created murals in cities across the United States, including Miami, Dallas, and Washington, D.C. Patrons respond to, and purchase his paintings. *See* Exhibit 12; Exhibit 16. Mr. Saturne exhibited his art at the fall 2019 Art Basil in Miami, *see* Exhibit 16, and he later also showed at a restaurant in Washington, D.C., *see* Exhibit 12 ("I actually met him about two years ago at one of his events. It was an all-Black affair and as humble as he was, he never introduced himself to me while I was looking at his artwork. He would just explain what some of the things were [and] what the artist was trying to do."). When Mr. Saturne was arrested, law enforcement observed that he had converted one room of the two-bedroom apartment into an artist's studio and stored approximately 30 completed works of art. Law enforcement also observed that Mr. Saturne maintained a separate storage unit until that was full of finished artwork. Mr. Saturne's website and Instagram accounts helped with marketing, although contributing little to sales.

Like some other working artists,[4] Mr. Saturne made little money from his artwork but it gave him great personal satisfaction. Mr. Saturne's creativity and art also benefit the community. Antonio Jackson, a Community Supervision Officer with Court Services and Offender Supervision Agency (CSOSA) observed Mr. Saturne "on multiple occasions volunteering teaching different art techniques at a community recreation center." Exhibit 14. Mr. Saturne then agreed to serve as a youth mentor. "Mr. Saturne is now a mentor for two young adults. Both mentees look up to him as a big brother. Mr. Saturne shares with his mentees information about his own career path, as well as providing guidance, motivation, and emotional support," *id.* Discussing Mr. Saturne's passion for art, his friend Andrea George writes, "I think it is really cool for younger black boys/kids to see and be inspired too." Exhibit 11. Mr. Saturne's talents give him a strong platform for success outside of the drug trade when he is released from custody.

Without money from drug sales and with little money coming in from his artwork, Mr. Saturne lived off stock and bitcoin investments he had made. As his money started to run out and the pandemic seemed to slow, Mr. Saturne re-started his illegal drug business. He was already on the government's radar from 2019, and agents promptly placed an undercover source before him in a reverse sting operation. Mr. Saturne saw the "easy money." He bit. And he got arrested. Mr. Saturne's fall from the boy who cared for his sisters and the sergeant who cared for his soldiers became complete.

///

///

---

[4] Counsel has a professional working artist in his family and a daughter about to go to college who, for better or worse, wishes to direct an education aimed toward a creative career and lifestyle.

## II.      Nature and Circumstances of the Offense

The Statement of Facts agreed to by Mr. Saturne and reported in the PSR, correctly describes the offense conduct. Mr. Saturne admitted to participating in a conspiracy of sales between 15-50 kilograms of cocaine from July 2019 to June 2021. During that period of time, Mr. Saturne made no sales for about a year from late 2019 until early 2021 due to concerns about his distributor and the effects of COVID-19. Mr. Saturne typically obtained 2-3 kilos at a time. He would pay $26,000 per kilo and sell them for $34,000-35,000 per kilo.

The attempted purchase from the confidential source in this case was – similar to Mr. Saturne's prior experiences – for 2-3 kilos of cocaine. At the outset of the speaking with the confidential source in May 2021, Mr. Saturne, however, puffed his interest and claimed that he wanted to purchase 15 kilograms of cocaine. Mr. Saturne had never purchased that much at one time. He was trying to grab the attention of the perceived distributor. As they negotiated details of the sale, Mr. Saturne reduced the puffed interest to 10 kilograms – again more than he had ever purchased at once and more than he expected to purchase from this potential new supplier. The price per kilogram was $26,000, with an additional $1000 per kilogram for transportation cost.

By the time of the actual face-to-face, Mr. Saturne reduced, yet again, the amount that he claimed that he wished to purchase – now to 5 kilograms in total with 2 of those kilograms for Mr. Saturne himself. The money recovered and observed in this case corroborates that Mr. Saturne intended to purchase 2 kilograms that day at $27,000 per kilogram (for a total of $52,000). When arrested that day, Mr. Saturne had $35,640 on him – enough to purchase approximately 1.5 kilograms. Mr. Saturne's co-conspirators LaTia Tucker and Leon Jackson, each pending charges in 1:21-MJ-308, apparently intended to provide the funds for the purchase

of any additional cocaine. Mr. Saturne reportedly observed one of those co-conspirators with approximately $17,000 in a book bag – enough to sum to $52,000 and complete the purchase of the second kilo. Additionally, the co-conspirators reportedly said that they had more money on them, which made it possible that they would seek a total purchase greater than 2 kilograms.[5]

### III.    Post-Arrest Conduct and Acceptance of Responsibility

Law enforcement arrested Mr. Saturne on June 21, 2021. That very day, he made it clear that was ready to accept responsibility and to be held accountable for his crimes. Mr. Saturne voluntarily spoke to law enforcement on the day of his arrest and voluntarily provided access to his cell phone the very next day at his initial appearance. Mr. Saturne waived preliminary hearing on June 25, 2021. Since his arrest, he made it clear that he would be cooperative with the legal process, plead guilty, and accept the Court's judgment and sentence.

Mr. Saturne was held until August 12, 2021 when the Court released him on personal recognizance, with conditions. Mr. Saturne has largely complied with all his conditions. He got a job. His employer is very happy with Mr. Saturne's commitment and performance. Exhibit 19. Mr. Saturne has tested negative on all his drug screenings. Mr. Saturne is either at work or home – traveling between the two of them and not socializing. He understandably troubled his pretrial supervision officer, and the Court, by making unapproved brief stops on his travel route. Those stops are few in a much larger pool of responsible, compliant behavior. The Court has issued a

---

[5] Mr. Saturne's case is not remotely like that of the putatively related case of *United States v. Dahl Harper*, 1:19-CR-306-LMB. In addition to not being safety valve eligible, Mr. Harper possessed and forfeited *five* firearms and had both a much higher offense level and a criminal history category. Mr. Harper also did not enter a pre-indictment plea; rather, his plea was long after indictment and the setting of multiple trial dates. Mr. Saturne is not referenced in Mr. Harper's arrest affidavit, plea agreement, statement of facts, government's sentencing memo, or defendant's sentencing memo. The cases are barely related and certainly dissimilar.

show cause concerning that behavior, and counsel expects that pretrial will have updated, positive and encouraging information at the time of sentencing.

Mr. Saturne provided a statement to the PSR writer in which he makes clear his acceptance of responsibility for his crimes. He admitted his criminal behavior and addressed its harm. He disappointed his family who had placed their trust in him, and he helped fuel drug addiction and criminal behavior in the community. "I am responsible for that. I'm very sorry for what I did, and I recognize that I am going to be punished for my conduct." More than that, Mr. Saturne has written a letter directly to Your Honor herself. Exhibit 1. Counsel knows that the Court will read the letter in full. It includes: "I am accepting responsibility for my actions. At some point in life I got lost along the way. Lost may be an understatement," *id.* "I shouldn't have any 'buts' what's wrong is wrong.," *id.*

Mr. Saturne has damaged his family's good name. Mr. Saturne's sisters corroborate the deep shame that he expressed to family: "In the first phone call he made to our family he was so embarrassed and just kept apologizing and stating how he let us down . . . ., and I've never seen him more ashamed." Exhibit 3. "These past four months, I have seen the change in my brother. He calls my parents more, cries with my mother on the phone and makes sure to attend our weekly prayer sessions virtually. He is not only remorseful, but he is embarrassed and ashamed." Exhibit 4. "Since this past June, I've seen a positive shift in Marcelin's actions. He attends our weekly prayer sessions virtually, he checks in with us more often, and he's also become more patient. Not only with us but also with himself." Exhibit 5. Mr. Saturne's shame extends to the next generation, his children: "He is ashamed and remorseful especially because one day his children will know about this." Exhibit 2. *See* Exhibit 15 ("Since the arrest Marcelin has been back on track to being a model citizen. He has rekindled his relationship with God, found a job

that would help him stay on the right path. I speak with him daily and he is truly remorseful and takes accountability for what he has done").

## IV.     Community and Family Support

Mr. Saturne has left the drug world behind him. He does not associate with the people he knew from that world. When they call or text him, he avoids them. He lives with a very hard-working, responsible third-party custodian, who attests to Mr. Saturne's general good character and good conduct while on conditional release. Exhibit 20. He works a full-time job. Exhibit 19. He has not used marijuana since his arrest. He still drinks more than he should and he still perseverates about gambling, but he has actively tried to get psychological counseling and is ready to reap its benefits for the first time since leaving Iraq. Mr. Saturne's addictions are appropriately viewed as reactions to his untreated mental health concerns, and he will benefit from drug and alcohol (and gambling) education and treatment programs, as well as from mental health counseling.[6]

Mr. Saturne is maturing. He stays in regular contact with his parents and sister. More than that, he takes *very seriously* that he is a father, with a father's obligations. He Facetimes, texts, and telephones with his daughter, A.B.,[7] who lives in Central Virginia. A.B. reached out to learn about her dad about three years ago. Mr. Saturne was thrilled to learn he had a daughter (while also hurt that her mother had kept the information from him for so long). A.B. and Mr. Saturne

---

[6] Mr. Saturne has an entrepreneurial spirit. His entrepreneurial nature led Mr. Saturne to engage with a real estate agent, *see* Exhibit 11, Exhibit 12, and to hire a lawyer before his arrest to advise him with regard to opening his own café. That attorney appeared both at Mr. Saturne's initial preventive detention hearing and his change of plea hearing. Those plans are on hold, pending a return to the community from any incarcerative sentencing.
[7] Counsel uses initial to protect the child's privacy. The child's full name is provided in the PSR. Photographs of Mr. Saturne and his daughter are attached as Exhibit 22.

love each other. A.B..'s mother writes about Mr. Saturne's positive emotional connection and active role in her daughter's life. Exhibit 7.

In addition, Mr. Saturne spends time – at his apartment, not outside in violation of his release conditions – with his girlfriend, Jackie Silva-Medina, who is a patient liaison with North Star Anesthesia Services. Mr. Saturne and Ms. Silva-Medina have been friends for three years. They became a couple in March of this year. Ms. Silva-Medina just learned that she is approximately 33 weeks pregnant with Mr. Saturne's child. *See* Exhibit 23. Ms. Silva-Medina's due date is January 15, 2022. Ms. Silva-Medina and Mr. Saturne are committed to each other and joyful to have a child together, while cognizant that his actions make the timing precarious.

Mr. Saturne takes seriously his relationship with A.B., and he takes seriously his relationship with Ms. Silva-Medina. He has relationships worth living for, and worth staying out of jail for. He knows that he will be held accountable for his crime here, but he is also committed that he will avoid any criminal behavior in the future. He sees that he has too much to lose by mistakes and much to gain by doing well. Those close to him see that probation, not jail time, properly accounts for his conduct while deterring Mr. Saturne and others. *See, e.g.*, Exhibit 13, Exhibit 14, Exhibit 15, Exhibit 20.

Mr. Saturne has extensive community support. His parents *and he* did well in raising his younger sisters. Each graduated from college. Each is a hard-working, solid, contributing member of society. One sister, Sandra, was ready to move to Washington, D.C. and find a job in this area if his current roommate Mr. Zimmerman were not deemed a suitable third-party custodian. Mr. Saturne has good, stable, law-abiding friends. Dennis Ihedioha attended Mr. Saturne's court hearings and wrote letters to the PSR author to confirm that he loaned Mr. Saturne money to assist him with financial needs while he has been on release just as Mr.

16

Saturne had assisted him in the past. Mr. Ihedioha regularly calls Mr. Saturne to check up on him and will be there for him. Exhibit 13. Other friends too have attended court hearings and supported Mr. Saturne get back on his feet – legally. *See, e.g.*, Exhibit 9 ("Since his arrest, several local people have joined to give the help he needed, which shows he is loved in the community."); Exhibit 20. Family and friends describe Mr. Saturne has someone with "a heart of gold," Exhibit 6, who looks out for and helps his friends, *see* Exhibit 8 (describing Mr. Saturne as a "very selfless individual that made sure his friends, such as myself, is always happy as well"). He "has improved; he doesn't want to be around people who caused him trouble; he realized it took him to a bad place." Exhibit 6. "He has unfriended hundreds of people on Instragram, as he wants no distractions in life and only wants his quality friends and family around him." Exhibit 17.

Those persons with support systems – and the will to succeed – *can* succeed. Mr. Saturne is just such a person. Whether on probation or supervised release after a period of confinement, he will use the supervision and support to get his life back on the track promised before he mis-stepped down the road of drugs and despair.

## V.    Special Sentencing Concerns

a.    <u>Extended Probation</u>: Defense counsel asks this Court to place Mr. Saturne on home detention, and, rather than incarceration, to impose a lengthy period of probation. Studies show that probation is a far better deterrent than a sentence of incarceration. Such a sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence to criminal conduct, and protects the public from further crimes of the defendant. *See* 18 U.S.C. 3553(a)(2). Incarceration will also set him back from

17

making amends, caring for his children, and moving forward productively in life. This is Mr. Saturne's *first offense* since before just barely an adult before he joined the military. A sentence of probation will ensure that he does not mis-step in the future.[8]

b.  <u>COVID-19 Concerns</u>: The risk of contraction of the coronavirus and the long-term health risks are relevant considerations in sentencing. The country, and the federal Bureau of Prisons, have not yet come out of the dangerous conditions of this pandemic, including the most recent variant and future variants. Putting aside the possibility of death, the long-term health damage associated with contracting COVID-19 is itself a serious concern. Doctors know that contracting the disease will have negative long-term effects, even if the full scope is known. Both for Mr. Saturne, other inmates and BOP personnel, and the greater community, a sentencing decision that avoids increasing prison population is appropriate.

c.  <u>Drug Treatment</u> – Mr. Saturne has a history of substance abuse, particularly alcohol, marijuana, and cocaine. The Court should impose as a requirement of home detention and probation that Mr. Saturne is assessed for, and completes, a substance abuse treatment program. If the Court elects to order a sentence of incarceration, counsel urges the Court to order that Mr. Saturne enter and complete the U.S. Bureau of Prisons ("BOP") **Residential Drug Abuse Program ("RDAP")**. RDAP is an intensive 9-month, 50-hour substance abuse

---

[8] Mr. Saturne is currently unable to pay a fine. He has negative total month cash flow and, excluding a watch currently possessed by the manufacturer in Europe, his liabilities exceed his assets. If placed on probation, in addition to his responsibilities to his children, he likely could set aside some money for a fine.

rehabilitation program offered to federal prisoners who quality (and Mr. Saturne clearly does) and who voluntarily elect to enroll.

d. <u>Recommendation of Local BOP Facility</u>: If the Court elects to order a sentence of incarceration, counsel asks the Court to recommend a BOP facility that is relatively close to Northern Virginia/Eastern District of Virginia **that provides inmates the option of entry to RDAP program.** A facility closer to this area, such as Cumberland FCI, would allow Mr. Saturne's girlfriend and his family to visit, which has rehabilitative benefits. Importantly, a nearby facility is inappropriate if it does not offer the RDAP program. The ability to participate in RDAP is more important than the locale of the facility, although a nearby facility that has the program would be ideal.

e. <u>Self-Surrender to BOP</u>: Ms. Medina-Silva just learned that she is pregnant. Her next doctor's appointment is December 21, 2021. Exhibit 23. Her due date is January 15, 2022. If the Court elects to order a sentence of incarceration, counsel ask the Court to order that Mr. Saturne be permitted to self-surrender to BOP no earlier than February 14, 2021.

f. <u>Credit for Time-Served</u>: Mr. Saturne seeks credit for time-served for the approximate two months that he was in the custody of the U.S. Marshals Service.

**CONCLUSION**

For these reasons and any that shall be advanced at the sentencing hearing, counsel for Mr. Saturne respectfully requests that, if the Court rejects imposition of a lengthy sentence of probation, this Court impose a sentence of no more than 18 months of incarceration, with recommendation of RDAP program and credit for time served.

Respectfully Submitted,

/s/ EDWARD J. UNGVARSKY
Edward J. Ungvarsky
Ungvarsky Law, PLLC
114 North Alfred Street
Alexandria, VA 22314
Counsel for Marcelin Saturne
Office - 571 207 9710
Cellular – 202 409 2084
ed@ungvarskylaw.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of this Memorandum was served ECF to the government and all registered recipients on this 7th day of December, 2021.

/s/ EDWARD J. UNGVARSKY
Edward Ungvarsky